Good morning, everyone. We have five cases on today's Oral Argument calendar, and we will begin with the Consolidated Appeals in Numbers 25-2003 and 25-2070, Boldt Company v. Black & Veatch Construction. Ms. Frye. May it please the Court. Melanie Frye for the appellant, Black & Veatch Construction, Inc. BBCI terminated Boldt because it failed to maintain the construction schedule, a schedule that was tied to exposure of severe liquidated damages for BBCI if not complied with. Boldt was so behind that we fully terminated them less than two months into the contract with Boldt not having erected a single wind turbine. Liability was established pre-trial, and the parties prepared for trial on damages only, but the trial went off the rails in two major ways. First, Boldt injected evidence and argument into the trial that the district court itself, at the end of trial, agreed was irrelevant for the jury's consideration of the issues and instructed them to disregard. This honorable court is no doubt familiar with appeals in which an appellant decries the district court's decision to admit certain evidence, but in this case, the trial court itself noted the error. The improper evidence was not merely one docket entered one afternoon in the middle of trial. It was pervasive, and it was emphasized, and in the face of that error, the court's limiting instruction buried in the jury instructions at the end of trial in a 29-page packet was simply not enough, and its nominal damages instruction served only as an improper outlet for the jury's confusion. And second, a Rule 26a disclosure violation injected prejudicial error into the trial. One of the opinions given by the plaintiff's expert, Sam Hadley, was actually expressly disclaimed in her report. Both Boldt and the court below claim harmlessness in these errors, but interestingly, both also claim that, well, that evidence, we were using it to challenge the credibility of BBCI's two damages witnesses. Well, what I read Judge Wood to be saying is that the Venn diagrams on evident liability-based evidence and damages-based evidence are not completely separate, that there can be an overlap, and that as the district court judge, it was her responsibility to figure out where those lines should be drawn, and why shouldn't we afford that quite a bit of discretion, because I don't think there's any doubt that some damages-based evidence can also bear on liability, or vice versa. I think Your Honor's correct that some evidence can absolutely straddle the divide. Here's evidence that came in that didn't. The evidence was presented that Boldt successfully performed on prior wind farm projects, right, like that BBCI, we were responsible for schedule delays, Boldt's shock that it was terminated, Boldt's compliance with the subcontract evidence in the record at 1746, and Boldt's belief that BBCI had defaulted on the subcontract. The record sites are listed in our brief, but those are five of many examples we provide of evidence that could only go to liability. The court was very clear before the jury was impaneled that liability was not to be tried. She had decided we terminated Boldt for cause properly, and so evidence that BBCI didn't comply with the subcontract wouldn't go to damages. This kind of pre-termination conduct, that has nothing to do with it. When you had that coupled with the other errors, coupled with the evidence of de-scoping, which again, the court itself at the end of the trial says, never mind, disregard. All that came in on the difference in de-scoping and termination, disregard that. And the evidence that came in on whether or not BBCI gave proper notice of termination. Again, whether we gave proper notice, the court has already decided as a matter of law, we properly terminated. Can I ask you a question about that? Let's imagine, just take this as a They were all due to BBCI and GE. Just imagine that. Would it still be your position that Boldt could not sue for wrongful termination given the notice and exculpatory clauses of the contract? Absolutely. The contract and the way it's set up makes it very clear, because of the exculpatory clauses, that what they claim, right, you didn't have your pad sites correctly formatted, that the construction works are deficient, that's their claim. All delays are on them, unless... Including BBCI's own delays. I mean, it's quite a contract, right? If, let's say, BBCI can cause a delay, and then Boldt doesn't notify BBCI of its own delay, and then BBCI can terminate Boldt, and Boldt can't sue for wrongful termination. I'm just trying to make sure I understand that that's what you think the contract says. And not abnormal in sophisticated parties in a contract of this kind, where you have this narrow window to erect a wind farm, right? The wind is less in the fall than it is in the summer and the winter, so we gotta get this done quickly in this three months. And the contract is set up that if you think something has happened that is going to cause delay, you have to comply with these conditions preceding it to give notice, so it can be quickly addressed right then, right there. Because we can't just wait, and then, oh, that email I sent you, maybe that was it. That's not how the contract is set up. And so it was contracted for between these sophisticated entities, and it's not uncommon in this kind of thing, is here's our window, here's the construction schedule. It is a material term. If you don't meet it, it is on you, unless you comply and give notice and say, actually, it was GE, the turbine vendor, or actually, it was BBCI, here's specifically what happened, and comply with these notice provisions. And the district court correctly held that they did not, that there was not even a fact question that they did. I think it's interesting to look at. That's a hard, I'll tell you, that conclusion, at least, if I take one, there is so much correspondence between the parties here. And if I take one example, if I, maybe two, the September 5 and the September 6, 2019 letters, and you read, those letters are read against the backdrop of the broader correspondence, which it would seem is a quite reasonable thing to do. These parties are not strangers to one another. When we hit September 5, it is very hard for me to see how that, how that's, how the notice is insufficient, or at a minimum, not debatable. The only way it's not is to put, is to put the requirements of the subcontract under a microscope, and then do a side-by-side with that letter. The September 5 letter, for example, and then just flyspeck the daylights out of it. I don't know how that's not a jury question, honestly. It's not a jury question because of the explicitness of the contract, because of its detail, because of the conditions precedent. I mean, what's not detailed about the September 5 letter when you read it against the backdrop of all the, of all the other correspondence going on? I know I'm plucking one example out, but it's an example that came at a pretty material time in the back and forth between the parties, and it's awfully detailed. Here's a couple of things I would note about the September 5 letter. Bolt was already in material default at the time this is sent. The letter does not reference a notice provision. It doesn't say, hereby we invoke this or this. It says, the letter is in response to our request for recovery. You don't think the parties are aware of the contract? I'm sorry, Your Honor. The parties have to be aware of the contract that provides the backdrop of the correspondence. All the more reason, I would argue, for Bolt to then comply with it, to then invoke it and say, I know this is specific and this is what's required of me to have to shift this burden, and so I therefore will comply with it. Here, importantly, the September 5 letter does not reference the section for owner-purchaser delay, and the last sentence says, we will give notice. Sometime in the future, we'll send a 552.18 notice regarding claims later. That is not what the contract requires. I think, critically, there's a distinction between the GE delays and the BBCI delays, and the BBCI delays actually require some kind of delay to the critical path, this overarching critical path. There's nothing there. There's nothing in that letter that says, here's the notice. Here's exactly how this is working. We actually need an extension of two weeks because here's the delay. That's why it's deficient, and that's why there's no fact question. The court is entitled to- Those charts on page, whatever it is, three or four of the letter with where we're at now versus our revised forecast, those don't do it? Not enough- At least to create an issue of fact? Not because of the critical path requirement, not because the language of the contract is clear. The district court is allowed as a matter of law to construe that, and this is not a question of the sufficiency of the notice. I know that Bolt, in their brief, cites a case for that and says, well, it can be sufficient. Isn't it kind of enough? We put in our reply why that case is distinguishable, but that's actually not the standard. The standard is, what did you bargain for? What did the parties bargain for? What was that notice supposed to look like, and was it given? And to point to a number of, oh, we sent these emails, we sent this letter, this is on September 5th, it was actually in response to you calling us out and us saying, give us a recovery plan, and in response they're saying, well, this happened and here's the chart. The owner-purchaser delay provision is specific and does require this critical path invocation and this detail, and it's not there. It's not there. In the summary judgment record, the court will also see a distinction between the summary judgment record and then the motion for reconsideration that was filed, and I would just call that to the panel's attention. In the summary judgment record, they actually, they don't even take this route. Their evidence is wholly deficient, and then on reconsideration, they're saying, yeah, but this and this and this, and the court is saying, no. None of that changes the analysis because I'm construing the contract, and these letters don't have those provisions. With regard to the actual trial, because the court was correct to decide this issue of liability on summary judgment, and we would ask that that be affirmed, the trial was supposed to be one of damages. I've talked a little bit about the evidence that came in that was improper on liability, but there was a really crucial error in addition to that, and that was the undisclosed expert opinion. Rule 26A requirements, they are strict also, but well-founded, and they require an expert to provide a written report that includes a complete statement of all opinions the witness will express and the basis and reasons for them. Sam Hadley was the plaintiff's expert, and it's interesting in her first report, she says, I don't have the materials necessary to quantify the criticisms of BVCI's claim, and her report actually says this, quote, it does not address the impact of recoveries BVCI may have received from GE that essentially would have compensated BVCI for costs that may be included in this claim, close quote. And then what do we see happen at trial? We see the opinion. She directly addresses the GE settlement. This is yet one example. She claimed BVCI failed to segregate that settlement amount from its damages model to the tune of approximately $6.9 million, resulting in an alleged overstated claim. She also talks, testified at trial about blade damage cost, nothing about blade damage in her report, and then labor and equipment costs as well. What I want to call to this court's attention is the actual memorandum opinion and order that Judge Wood issues where she's looking at this, and the court actually concedes, quote, Hadley's report did not cover the specific costs on which she sought to opine. That's Judge Wood acknowledging, you know, it's not in there. We see this actually in the trial record in the transcript where you have Bolt's counsel admitting that's not in her report, record at 2270. You have the trial court making statements during her testimony like, quote, it sounds like that's very far beyond her report, close quote. So you have the court recognizing this is beyond it. And so the court's fix is she says, well, Hadley is not to give an actual dollar amount, but that restriction, as we know from the record, was meaningless because the dollar amount was given. As to the GE settlement, Bolt's counsel published a document to the jury that identifies the amount of the settlement, and he has Hadley opine about the document and that the calculation was overstated. And then as to the blade damage costs, he had her testify to basically a math equation, which led to an $8 million fine. You're focusing on, and I understand why, you're focusing on a lot of Ms. Hadley's testimony. I have a feeling that your adversary is going to focus on, or at least bring to our attention some of the difficulties that your two key witnesses had testifying because I think Black and Veatch, right, bore the burden on proving the damage. We did. And Mr. Miltenberger had difficulty testifying, as did the project manager. Is it Nilish Zerpe? Zerpe, correct. They both had trouble. I couldn't agree that they had trouble. They were transparent in the way that cost codes into litigation were looked at critically, were assessed to make sure they were coded properly, to be properly said, this is Bolt's fault. This is attributable to us taking over the work from Bolt. Here's what I want to point out. Because if it's just the dueling numbers and what did the jury think of these two witnesses, that's one thing. The jury's verdict was $1. It wasn't, you know, we think that amount's unreasonable, but here's the reasonable amount of damages. And certainly Bolt didn't put on evidence that it only cost us $1. I think the reason, at least as I read it, the reason it was $1 is because if the jury thought that Miltenberger and Zerpe, there were credibility problems with their testimony based upon the internal accounting and the way the damages were presented, then they just followed the jury instruction. There was no reasonable basis for the compensatory damage amount that Black & Veatch was asking for, and therefore nominal damages should be awarded of $1. And yet there was a reasonable basis. A nominal damages instruction should only come into play when there is no evidence. And in fact, the cases that Bolt cited... But we can't re-weigh all that on appeal now. A legal sufficiency challenge, I would argue that the court can. To look at it and say there was no evidence whatsoever, there's no way that anything was put on, nominal damages. There was some evidence. There was more than a mere scintilla. There was legally sufficient evidence. And then there was, you know, back and forth. That's not nominal damages. That's an actual weighing by the jury, and that's what didn't happen. We have at least some evidence. For example, the $1.77 million paid to Christian Electric and the $950,000 for purchase of materials from Bolt. They're essentially uncontroverted big-ticket items. In the light of that evidence, when there's something there, a nominal damages instruction that gave the jury this escape hatch was inappropriate. Well, didn't you waive that argument, though, below? We did not, Your Honor. Well, you have to object at the jury conference, and you didn't. We did. I would say that we did preserve it. What I would point to in the record is we objected to Bolt's proposed charge. This is docket 225. We both filed competing charges, docket 262. We filed an alternative charge that omitted the instruction on nominal damages. And then at the charge conference, which, as Your Honor is noting, BVCI maintained that the computation of damages instruction was not consistent with applicable law, record 2249 at 22 through 50. And the record demonstrates that the court was aware of our nominal damages objection because it explicitly analyzed and decided, in our opinion incorrectly, that nominal damages were available. The record at 2550, she says, I think the case law supports nominal damages. So in light of her saying, see, you've objected, you have objected, and we have Mr. Dark in the record saying, I do think there's a problem. I don't think it complies with the law. She acknowledges that. She overrules it, and on we go. And so the preservation happened contemporaneously at the time of the charge conference. You want to save your time? I will. Thank you. Yeah, very well. Mr. Scodro, good morning. Good morning, Your Honor. Good morning, Your Honors. May it please the court, counsel. I think, if possible, I'll start where the court just left off, which is the nominal damages award. This was not a zero damages award, which I think is what the input, I think my opponent is suggesting that the jury essentially threw up their hands and awarded zero or did half, as in one of the cases they cite. Instead, what we have here is the jury, they checked the first box on the verdict board, which said, do you have what you need to find what the damages here were? And they said, no, we don't. And therefore, they followed the instruction to award $1 in nominal damages. And to be clear, there's a distinction, and their brief doesn't always draw this distinction, and I want to make sure it's not being conflated here, between costs, reasonable costs, and damages. At times, they conflate by saying, look, everyone agrees, there must have been some cost involved to complete the project. And, of course, that's true. The question the jurors faced was, what is that reasonable cost? And bearing in mind, again, they were asking many multiples of what the remainder of the, or the entirety, actually, of the subcontract, which is about $15.4 million. What was the reasonable cost? And to what extent does that reasonable cost exceed the $15-plus million that remains to be paid under the subcontract? That's how you calculate it. That's how the court correctly instructed the jurors to calculate it. So whether or not there's agreement that it costs something to complete is completely immaterial. Judge Wood, in her opinion, on the post-judgment motion, particularly at pages 17, 18, through 20, 21, she provides all of the reasons, some of which have been mentioned already this morning, as to why these two witnesses, and all of this turns on Milton Berger and Zerpi, why these two witnesses, why a rational jury could have concluded that they simply had not provided what jurors need to find whether, much less to what extent, reasonable costs exceeded the damages, or that is to say exceeded the amount of money that they still had to pay under the subcontract, those expectation damages. And they couldn't do it. And they said they couldn't do it in the very first jury question. What's your response to Ms. Frey's suggestion that it's not quite that clean because Samantha Hadley's testimony beyond the scope of the Rule 26a disclosures polluted this a bit? Those are my words, not hers. But that's effectively what she's suggesting. Sure. So if we can just walk through a couple of those, Your Honor, the ones that they've highlighted both in their briefs and then again this morning. So the one I think that was talked about first was the amount of the settlement. Now the GE, the costs incurred by GE's delays and by the fact they were providing material out of order, that is mentioned in her report. Now there's a separate sentence that says, and this is the disclaimer, I believe, on which Black & Veatch is relying, she says, I'm not going to quantify, basically offset the effects of the settlement with GE and BBCI insurance payments, those sort of typical offsets that you can have in a damages case. I'm not going to quantify that. I'm not going to do those offsets. But what she didn't say, and she never did that, what she did is say, look, they asked for when GE, or excuse me, when Black & Veatch described the amount of damages that GE had caused, they put it in the, I think they asked, I think it was $6.4 million, I think they may have received $6.9, but in any event, a $6 million plus, a number they had assigned to it, and yet when it came to Milton Berger's cost coding, when he was identifying the amount of the payments that they made out of the total $89 million that Black & Veatch paid to complete, they subtracted $27,000 out for GE-related delays. All she was saying, in step with all of her other specific examples, was that, yet again, this cost coding methodology, whereby the expert meets 10 times with the client, and they decide on what's cost coded, and everything in certain codes gets attributed to Bolt. That methodology is unreliable, and it's specifically unreliable in this case. And that was another example. And so, too, Your Honor, with what Judge Wood allowed in terms of discussion of blade damage, this was also mentioned this morning, this was something that, again, what she was doing is taking Milton Berger's own examples from trial, and she was using them to illustrate to the jury all the ways in which this methodology is simply unreliable. And what the judge said is, look, I'm not going to allow her, that is Hadley, to identify brand-new numbers that appear nowhere in her report. And she didn't. They objected successfully to the reference to an $8 million, as we say in our brief, that they talk about, well, you know, she wanted to talk about $8 million in an overcharge. They objected successfully. She didn't get to talk about those numbers. What she did was, she said, even look at the examples that have been introduced at trial. They, too, show that this methodology is simply unreliable, and the jury agreed. And that's simply what happened. And to overturn that, we'd have to find that no rational juror could have concluded that this was unreliable testimony, and that Judge Wood abused her discretion in allowing this testimony in when it was merely, as she said, these are merely examples, further examples, without allowing quantification, further examples of Hadley's criticism, which was disclosed in black and white in her report over and over and over again. All of these things show that these codes, line by line, just don't work. She looked at the invoices. She looked at many, if not all, most of, I think she said at least most of the invoices. Hildenberger said he looked at 50 to 75 of the many, many invoices underlying this, was relying on this coding methodology. And she poked holes in that, and as the court found in the post-judgment, and again, finding, by the way, the testimony to be, in her words, cagey, which is almost unassailable on appeal as a credibility determination based on testimony and demeanor. She found the testimony to be cagey. It's simply, there's no surprise that the jury did exactly as instructed here. They did waive their objection, Your Honor, to the jury instruction. If you look at what they submitted in terms of their objections, they object to other language. In the submitted objection that was mentioned a moment ago, they object to other language in that same instruction. There are multiple points made in the damages calculation instruction. They did not say that Illinois law does not provide for nominal damages, and they certainly didn't say that Illinois law doesn't allow for nominal damages in circumstances where jurors don't have what they need to adequately calculate the damages amount. In fact, that is very, very close. It's not verbatim, but very close to the sample, the model pattern jury instruction in Illinois, which are presumed to be correct. And to the extent there were some wording differences, those words actually appear in the cases we cite in our brief. I had cited in support of that language. And they're not material differences. They just happen to come out of the cases. So not only did they... Do you want to comment on the notice issue? The whole, you know, the whole business about the notices were... The notices had a lot in them, but they were deficient because they didn't contain critical path impact projections and the like. Yeah, absolutely, Your Honor. Thank you. So we would urge this court, obviously, to overturn the summary judgment ruling. That is a de novo standard, unlike everything that happened at trial. The notices, and as we point out in our brief, we focus on November 5th, November 6th, August 15th. Those, in our view, they're photographs. There's video. And if you look at those photographs, you can see what the conditions look like. You have, you know, trucks literally sort of sinking into the mud in these photographs. What the notice provision requires, and we can discuss why that is a safe harbor that has no application here, consistent with Your Honor's earlier question, that that really would be quite a contract if it essentially created strict liability for delays not caused by both. But putting that to one side, even if that were the requirement, the notice was more than adequate here, Your Honor. The notice requirement is 3-4. There has to be timely notification of an event. Well, that clearly appears. Details of the delay, and I'm distilling 552.34.2. So this goes to purchaser-caused delay. Timely notification, details of the delay, and the effects on Bolt's performances. All of those appear in these letters. Now, to be sure, just like in Black & Veatch's letters to Cardinal Point, the general contractor, which we quote in our briefs, just like those, at the moment it's very difficult to say, here is precisely what will happen with regard to the critical path. It's going to cause a 14-hour delay or a two-day delay because they don't know how Black & Veatch is going to respond to these notifications. But if the idea, as my colleague on the other side mentioned, if the idea is to provide notice that something is slowing things down and to provide a specific understanding of what that is, both the charts, the photographs, the video, and the text of those letters more than adequately do that. And we know that they knew. And that is also relevant as a matter of Illinois law, as we point out. They were well aware. They were internally corresponding about these concerns. They were talking to Cardinal Point about GE delays. So at the same time, and by the way, there was a mention, I think, in passing that we were already in material default, by which I assume is meant that we were already behind schedule on November 5th, 6th. But there's nothing in those notice provisions. Again, we don't think they apply in this context. But there's nothing in those provisions that say you can't already be behind schedule when you start notifying about delays. And so I'm not quite sure I followed that line of reasoning. But I think that here, to your Honor's question, there was more than adequate notice. And we know that they actually knew, which, again, is independently dispositive on the notice issue. Can I ask you a question on your cross-appeal for a second? Yes. In your brief, I'm looking at page 63, if it's an easy point of reference. I'm looking at what you're asking us to do. Yes. OK. And you ask us to vacate the summary judgment to Black and Veatch, remand to trial on your client Bolt's breach of contract claim.  And affirm the $1. OK. If we vacate the district court's grant of summary judgment here, isn't it just the flip side of the coin of the original summary judgment award that was granted to Black and Veatch that sent the case to trial? Do you see what I'm asking? Because we have a claim. And then we have an initial lawsuit brought. And then we have a cross-claim.  OK. Forget the appeal for a minute. Right. And both sides, to be clear, moved on summary judgment on the other side's claims. On the other side's claims. Right. So we have cross-motions for summary judgment. And correct me if I get this wrong. And Ms. Fox can, too. But what the district court determined was that there's no material issue of fact on the for-cause termination.  Correct. And therefore, because there's no liability question on for-cause termination, the only thing that we need to have happen is we need to have a damages trial happen. Correct. Damages trial happened. And we have appellate litigation over the damages trial. Right. OK. But all along, your client was saying, well, it's not a for-cause termination. We think it was an unjustified termination. We think there's no cause. That would have been, yes. And that's the essence of your cross-appeal. Correct. We would like to take that claim to a jury. OK. So if we determine that there is a material issue of fact because of the notices or whatever Yes. on your primary claim.  That the contract was breached, we were terminated, and there was no cause for the termination. Right. Doesn't that necessarily mean, because it's just the flip side of the coin, that there was an error in granting summary judgment in Black and Beach's favor and just sending the nominal damages case to trial? All I'm trying to ask is that these just seemed like the inverse of one another. And so if you're right that your primary claim should go to trial, shouldn't the whole case go to trial? No, Your Honor. The way we would see this returning would be, we have a judgment of, if we materially breached the contract, a jury has held that they are entitled to $1 under those circumstances. If it's remanded, the trial would then be on whether or not Black and Beach materially breached by wrongfully terminating us. If the jury says yes to that question, then we would be entitled to seek damages. Yeah, right. Suppose they go the other way. If they go the other way. Suppose, for example, they say, Mr. Skodro, we actually, not only do we think there was no wrongful termination in any way, we actually think that Black and Beach had cause to terminate you bold. Then what do we do with the prior trial? Do we say, well, there's no damages phase that can happen because there's already been a trial on this? Yes. Our research indicates that that is the proper outcome, that there is a stopple. They have gone to jury on whether or not, what their damages are under those circumstances. There's no basis to disturb that award of $1. If that were to be the outcome. It would be like collateral estoppel or something? Right. Yes, exactly. That is our understanding of the proper procedural posture on remand. Mr. Skodro, the whole trial was sort of structured by the contents of the summary judgment decision. In fact, that is actually much of your argument in defending against the appeal here, right? I guess the trial itself would have gone quite differently had the district court ruled differently on the motion for summary judgment. In other words, if you're right as to your cross appeal, then you lose a lot of your arguments in your appeal, right? Because the arguments in your appeal are that the trial was consistent with a summary judgment decision. It was. In that respect, it was a pristine trial on what, if any, damages they are entitled to if, in fact, we have materially breached. And they've done that. And they have that number. And that number is $1. I think, in many ways, that's favorable to the notion that $1 stays. Because what would have come in otherwise? It would have been evidence of their delays or evidence of GE. It would have been how we had been performing from the beginning properly. And we're not in breach of any of the provisions. So I think that under those, that's what that trial would look like. It would have had more adverse evidence to the other side. What they had was a clean trial on what do they get if we were in breach. And we know that answer. See, if you're right on the cross appeal, it seems to me that what – and I don't want to be reductionist about this. So if there's something I'm saying that you think is mistaken, I'm going to put the same question in this box. Just push back. So what the trial is basically doing is putting to the jury the following question. There has been a termination of the contract. Just as a matter of objective fact, there's a letter terminating the contract. And so you, the jury, have to figure out, was that termination for cause or without cause? It's binary that way.  Because it's a breach of contract case. And depending upon whether it's for cause or without cause, that's going to channel us into different provisions of the subcontract to figure out how to measure the damage that way. Now, I know you're going to want to win. So you're going to want to say it's without cause. And then let's figure out what check they have to write. But suppose that Ms. Fox and her team prevails. It just seems to me that if we decide you're right on the cross-claim, aren't we almost necessarily vacating the original award of summary judgment because we're concluding that there's a material issue of fact about the termination of the contract? So only one side prevailed. I just want to make sure. So only one side prevailed on summary judgment. That was Black and Beach on ours. We lost, obviously. Summary judgment was denied, and we went to trial on what the damages would be if we breached. So let me just add one other point. There is a third option here. There is possible to have a breach for cause and still have a wrongful termination claim. And that's the section late in our brief where we explain that we were not given. You didn't recover what you have in it so far. There is that. There are bad contract damages. But even in subpart 2.3, which is termination for cause, there's a requirement that they give us seven days to at least begin curing. And as we've argued, we think there's at least a jury question as to whether or not we were in full effort to cure it within those seven days. And so we could be, actually. We could have a termination for cause, and it would still be a wrongful termination claim. I wanted to add that so that the record was clear. It's binary, but with another third option. Yeah, and the claim that is... I got to tell you, I spent so much time figuring out how in the world is there now a separate freestanding action between these exact two parties over this exact contract and in particular over an aspect of the for-cause termination? I think I understand how it happened, but that is a real mystery, I will profess. And recognizing that, as we say in our brief, we're more than happy to have this court award what everyone had agreed is some amount of back damages that's provided even in the event of termination for cause, which is to say compensation for work completed as of the termination date. To answer your earlier question, though, if we have two, and I apologize... Go ahead, we're going to give Ms. Fox some time, too. Or Ms. Fry, I'm sorry. So we have summary judgment. So their summary judgment, their claims went to trial because we lost on our defensive summary judgment claim. They prevailed on theirs. So what this would allow is they've gone to full trial. This would be as if, let's imagine, both summary judgment motions had been denied. Now, ours was, and so theirs went to full trial. That half of this case is done. We had a pristine trial on what the damages would be, if any, under theirs. So our summary judgment motion has sort of gone to trial because we lost on it, and the answer is $1. This would say, okay, now the other half of this case is open. We'd go to trial if they were to find that we materially breached and the jury were to further find that Black & Veatch complied with the notice requirements such that we are not entitled to any damages. That would be the judgment in that new trial. They would not, though, then be able to say, well, even though we put on a full trial on what our damages would be last time around, we can do that again now because I'm not sure why. The only new evidence would be evidence that would favor the notion that Bolt had not breached the contract. Thank you, Mr. Stokroff. Much appreciated. Thank you. May it please the Court. I'd like to begin with the letters, and this Court specifically asked about the September 5th letter and the letters that Bolt is claiming get it over the summary judgment hump. The September 5th letter specifically, I want to give the Court a record site, and that is docket 214 at note 7. Here we find Bolt's expert witness opining that there was not an owner-purchaser clause delay until late September 2019, long after all the notices at issue in Bolt's summary judgment were issued. And so its own expert acknowledges the September 5th letter would not be notice of an owner-purchaser delay because the expert is opining that that didn't occur until late September 2019. It wasn't at the, you know, contemporaneously on September 5th. The parties didn't understand it to be that, but here we have the expert confirming it on the back end. These notices beyond September 5th, notices must state the impact and ask for the specific relief, which we don't see in these notices. Bolt was also already in breach as of August 13th is the date. That was the material default. And as a practical matter, what the record bears out is there was no impact on Bolt's work, which is why they can't issue a letter saying it. That's why it's not in there, because there wasn't a material effect on Bolt's work. In fact, they were already way behind and had materially defaulted. Ms. Fry, can you address the remedial question that we were talking about with Mr. Scodro? Let's say we disagree with the reasoning of the summary judgment decision. What is the remedy? In that unfortunate circumstance, the remedy would be a new trial on everything. There are grounds for breach of contract that we didn't even submit in this case, right, because we won at summary judgment on this one kind of theory. And so there are grounds for breach of contract. There are damages and costs that just weren't at issue because of the posture that this case went to trial in. And so it would be opened up for the new trial. New trial on both sides on all issues. Including one of the points that they're making about even if there is a four-cause termination, that doesn't mean we walk away empty-handed. We still have a claim, or we still have... Yeah, we still have a claim to recover the amount that we have in the project. No. That one should be excluded, and here's the reason. They didn't... Sorry. Go ahead. Go ahead. They didn't bring the claim. They didn't bring the claim, right? Early on when we have these pleadings, on the eve of trial, they come to the trial judge and say, Oh, actually, we have this claim for contract damages, right? And the trial court, on the eve of trial, rightly says, No, that's too late. We're not going to amend our complaint right now. But all you're doing there is you're explaining how the separate lawsuit came into existence, right? There's a separate docket number. There's a plaintiff. It's the same parties. It is. It's what you're just describing that way. But what we were on a second ago was if everything is kind of reset, Mr. Skodro's client prevails on its cross appeal, and everything goes forward, then isn't everything kind of fair game with respect to his... I'm pointing at him, but his client, his request to recover the money they have in it in the event that's not the outcome they want because they want a without cause termination. And everybody's stuck. The discovery record's closed. The expert disclosures are closed. There's no do-overs on any of that. We just go to trial on the record as it existed. The hard part for me is figuring out if Bolt is right in its cross appeal, why does that not necessarily mean that the district court committed error in awarding you all Black & Veatch summary judgment because it's just the flip side of the coin, the same coin. In other words, if there's a material issue of fact over whether it was a proper for-cause termination, Bolt is saying there was no cause. Right? Isn't it just the flip side of the coin of you all saying we were justified in a for-cause termination? Because the termination, at least under this contract, it's binary. We know the event happened. Your client sent him a termination letter. So what the jury has to decide is whether it's for cause or without cause, and then there's a cascading effect from there with respect to damage computations. I don't think it would be binary in the sense of if summary judgment not for you, then for you. For example, when I said there were other grounds... No, I agree with that, but it just means that would the jury only be able to decide whether Bolt prevails as a... The jury would not be able to decide that there was a for-cause termination at a new trial? Let me give an example. You'd have to. Well, I don't know. I mean, it's up to you all to try to tell us, but... Yeah. Let's say one of the grounds that we said that Bolt materially breached was safety, none of which came in, because it was determined on a different ground on summary judgment. I would posit that it's not just a, well, you lose, and so your record is narrow now and you go back and the jury just asked them the same question on the same record. It was postured differently, and so there's differences that we would bring up if this were to be retried. I don't know if I'm answering Ira's question, but I just don't see it as, okay, if we reverse here, then automatically we just, everything's good, we go back to the jury, because it would be a very different trial with arguments that we would make regarding Bolt's original claim being barred. Okay, any final word? My time is up. May I have 10 seconds to put something into the record?  And it's only on this issue of, I know I spent a lot of time talking about the errors, the undisclosed expert opinion, and the evidence came in. Here's what I want to leave the court with. Bolt claims, all that stuff that came in, it was used to attack the credibility of your two guys, of Milton Berger and Zerbe. The district court tells us, the reason the $1 verdict is okay is because the credibility of those two guys was challenged. Improper evidence directly affects the verdict. There's harm. Thank you, Your Honors. Okay, Ms. Frey, thanks to you and your colleagues. Mr. Scodro, to you and your colleagues as well. We will take these appeals under advisement. Thank you.